# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| LYNN LUXICH, | |
| Plaintiff, | |
| v. | Civ. Action No. 04-6176 (KSH) |
| ALBERTO GONZALES, | |
| Defendant. | **OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

## I.    INTRODUCTION

In this employment discrimination case, Plaintiff Lynn Luxich ("Luxich") claims that from approximately August, 2002 until November, 2003, she was subjected to unlawful, gender-based harassment by certain of her superiors at the Newark, New Jersey office of the Federal Bureau of Investigation ("FBI").  Her complaint includes three causes of action: (1) gender-based discrimination in violation of Title VII; (2) hostile work environment in violation of Title VII; and (3) retaliatory harassment for filing an EEO complaint in violation of Title VII.  The FBI filed a motion for summary judgment on all claims and the Court held oral argument.  For the reasons expressed below, the FBI's motion for summary judgment is **granted**.

## II.    BACKGROUND

The following factual background is gleaned from the record, consisting of the complaint, the answer, attorney certifications, and depositions.

Luxich began working in the administration and support unit of the Newark, New Jersey office of the FBI in September, 1987.  (Luxich Dep. at 3:15–16.)  In January, 1995, she was

promoted from Financial Analyst to Financial Manager ("FM"), and she worked full-time as FM until February, 1998.  (Id. at 6:20–7:22.)  During the period at issue (August, 2002 to November, 2003), she reported directly to Administrative Officer Dorisse Shakir-Ullah ("Shakir-Ullah"), who in turn reported to Assistant Special Agent in Charge of Administration Pedro Ruiz ("Ruiz").  (Stip. of Facts, Final Pretrial Order, at 4.)

On March 1, 1998, Luxich, with the permission of then-Special Agent in Charge ("SAC") William Megary, began working as FM of the Newark office on a part-time schedule so she could spend more time with her newborn child.  (Luxich Dep. at 13:24–14:7.)  In this capacity, she worked 28 hours per week, consisting of two ten-hour days and one eight-hour day. (Stip. of Facts, Final Pretrial Order, at 4.)  In March, 2000, Luxich gave birth to her second child and took a six-month maternity leave.  (Luxich Dep. at 15:5–9, 16:16–19.)  When Luxich resumed working in September, 2000, she received permission to remain in the FM position in part-time status in order to allow her to care for her two children.  (Id. at 16:20–25, 18:5–7.) When SAC Megary left the Newark division, his replacement, Louie Allen, approved Luxich's part-time schedule on June 17, 2002.  (Id. at 36:21–23; Compl. at ¶ 11.)

Ruiz joined the Newark office in April, 2002 as the Assistant SAC ("ASAC") in Charge of Administration.  In August, 2002, he asked Luxich to return to full-time status.  (Luxich Dep. at 36:10–15.)  Ruiz testified that he wanted Luxich to return to work full-time because out of the 35 supervisors in the Newark office, she was the only one who worked on a part-time schedule and he wanted a full-time FM in the Newark office to supervise the financial department's staff. [1] (Ruiz Dep. at 27:3–5; Def.'s Moving Br. at 4.)  Luxich declined, citing childcare and family

---

[1]  In his deposition, Ruiz indicated that there were 56 supervisors in the Newark office, but the FBI's brief indicates that there were only 35.  The discrepancy was not explained, so the Court will assume that the correct number of supervisors is 35.

medical issues, as well as the fact that SAC Allen had approved her part-time status.  (Luxich Dep. at 36:21–37:4.)  Over the next five months, Ruiz requested Luxich to resume full-time status approximately six or seven times.  (Id. at 39:19–41:9.)  Luxich declined for the same reasons she initially provided.  (Id. at 41:12–19.)  Luxich testified that on more than one these occasions, Ruiz asked her, "Haven't we accommodated you enough?"  (Id. at 41:19–23.)  Ruiz also asked Luxich why she couldn't get a babysitter to watch her kids and after Luxich became upset, Ruiz told her to stop "being emotional."  (Id.)  Luxich claims that Ruiz's repeated requests to return to full-time status and his comments made after she declined to do so, were the beginning of a campaign of gender-based harassment against her.

On April 7, 2003, after several other incidents of perceived gender-based discrimination that are described in greater detail below,  Luxich mailed a complaint of discrimination to the Department of Justice's Equal Employment Opportunity ("EEO") office.  (Decl. of John Boppert, Ex. A, at 6.)  The complaint, which was stamped "received" by the EEO office on April 11, 2003, alleged that SAC Allen and Ruiz were discriminating against her based on her gender.  (Id. at 1.)  On April 10, 2003, Shakir-Ullah, who claims she was unaware that Luxich had mailed her EEO complaint only days earlier (Decl. of Kathleen O'Neill-Taylor, Ex. 7, at 6), informed Luxich that she would be removed from the FM position if she refused to resume working full-time.  (Stip. of Facts, Final Pretrial Order, at 6.)  Regardless of Luxich's decision, Shakir-Ullah advised her that she would have to return to a full-time schedule in some capacity in October, 2003 so that other employees in the office could take advantage of the office's part-time policy.  (Id.)  Luxich once again declined to return full-time as the FM, and as a result, she was asked to train Financial Analyst Peter Wong ("Wong") so that he could serve as Acting FM until a permanent replacement could be found.  (Id.)   Although Luxich's pay was not decreased,

Wong's name appeared in the FM box of an employee organizational chart dated April 15, 2003. (Decl. of John Boppert, Ex. B.)  For several weeks in May and June 2003, Wong sat in the FM office that Luxich had previously occupied, and Luxich worked from a desk in a back room that did not have a phone or a computer.  (Luxich Dep. at 137:4–21.)

After being informed on June 20, 2003, that she might be dismissed from the FBI if she refused to return to full-time status in some capacity, Luxich changed her mind and agreed to work as FM full-time beginning October, 2003.  (Ruiz Dep. at 35:2–36:25)  As a result, she was permitted to retain the FM position in part-time status until October, 2003.  (Luxich Dep. at 76:12–14.)   After working as FM full-time for approximately 1 month, Luxich voluntarily transferred to a lower paying position in a different department of the FBI in November, 2003. (Stip. of Facts, Final Pretrial Order, at 7.)  She claims that she made the decision to transfer departments in order to escape the hostile work environment and harassment she had been subjected to by Ruiz and Shakir-Ullah.  (Compl. at ¶ 58.)

Final action was not taken on Luxich's EEO complaint within 180 days of filing, so Luxich filed suit pursuant to 42 U.S.C. § 2000e-5(f)(1) on December 16, 2004.  The complaint is brought under Title VII and includes claims of gender-based discrimination, hostile work environment, and retaliation for filing an EEO complaint.  The FBI has moved for summary judgment on all claims.

## III.   STANDARD

A court may grant summary judgment if the moving party "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is made . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading,

but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).

## IV.   ANALYSIS

The FBI raises two main arguments: first, that certain of Luxich's claims are barred because she failed to exhaust her administrative remedies; and second, that even if the claims are not procedurally barred, there is no evidence beyond innuendo or Luxich's subjective beliefs that the complained-of conduct was undertaken because of her gender.

## 1. Exhaustion Requirement

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997). The Third Circuit has explained that "the purposes of the exhaustion requirement are to promote administrative efficiency, 'respect[] executive autonomy by allowing an agency the opportunity to correct its own errors,' provide courts with the benefit of an agency's expertise, and serve judicial economy by having the administrative agency compile the factual record." Id. (quoting Heywood v. Cruzan Motors, Inc., 792 F.2d 367, 370 (3d Cir. 1986)). In determining whether administrative remedies have been exhausted, the Court must evaluate whether the acts alleged in the subsequent Title VII suit "are fairly within the scope of [the prior] EEOC complaint or the investigation growing out of that complaint . . . ." Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam).

To exhaust administrative remedies, federal employees must initiate contact with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of

personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

The Supreme Court has noted that "[b]y choosing what are obviously quite short deadlines,

Congress clearly intended to encourage the prompt processing of all charges of employment

discrimination."  Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980); see also Ledbetter v.

Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2170–71 (2007) (noting that "short deadline[s]

reflect[] Congress' strong preference for the prompt resolution of employment discrimination

allegations through voluntary conciliation and cooperation").   However, if an aggrieved

employee can show that she "was not notified of the time limits and was not otherwise aware of

them," equitable tolling may be available to save the discrimination claim.   29 C.F.R. §

1614.105(a)(2).

It is undisputed that Luxich's first contact with an EEO counselor occurred on February

25, 2003.  Thus, only those incidents occurring on or after January 11, 2003 (45 days prior to

February 25, 2003) were timely brought pursuant to 29 C.F.R. § 1614.105(a)(1).  All but two of

the incidents that Luxich brought to the attention of the EEO counselor on February 25, 2003

occurred prior to January 11, 2003: (1) when Ruiz assigned Luxich to reformat a budget analysis

on February 3, 2003 that she had previously created; and (2) on February 13, 2003, when Ruiz

allegedly instructed her not to speak with SAC Allen "unless it was about the weather."  Luxich

later supplemented her EEO complaint to include the retaliation charge, so that allegation was

also timely filed.  The issue, then, is whether Luxich is entitled to recover damages for events

occurring prior to January 11, 2003.

The events Luxich complains of which occurred prior to January 11, 2003 are as follows:

1.  On six or seven occasions between August, 2002 and December, 2002, Ruiz asked
    Luxich to return to full-time status.  (Compl. at ¶¶ 14–18.)

2.  On more than one of these occasions, Ruiz asked her "Haven't we accommodated you
    enough?"  Ruiz also asked Luxich why she couldn't get a babysitter to watch her children

and after Luxich became upset, Ruiz told her to stop "being emotional."  (Compl. at ¶ 51.)

3. On September 16, 2002, Ruiz assigned Luxich supervisory responsibility over Property, Inventory, and Procurement.  Ruiz refused to allow Luxich to assume responsibility over these areas on October 1, 2002, after the fiscal year ending September 30, 2002 ended. (Compl. at ¶¶ 19–20.)

4. On multiple occasions in September, 2002 and November, 2002, Ruiz and Shakir-Ullah refused to provide Luxich with training as to how to supervise the Property, Inventory, and Procurement functions.  (Compl. at ¶¶ 19, 21–23.)

5. On November 21, 2002, Ruiz commented that a newly created communications center would be a good place for "misfits," such as pregnant women, to work at.  (Compl. at ¶ 52.)

6. On December 10, 2002, Ruiz told Luxich that she was not permitted to speak with other ASACs in the office, even if it involved financial matters.  (Compl. at ¶ 24.)

Luxich argues that she is not barred from recovering for these instances of alleged discriminatory conduct for two reasons: (1) there has been no discovery on the issue of whether she was aware of the 45-day time limit and thus the Court cannot decide if she is entitled to equitable tolling; and (2) even if the 45-day limit did apply to her, she can still recover under a theory of hostile work environment because the discriminatory acts occurring within the 45-day period were part of a hostile work environment that started several months before January 11, 2003.

Luxich's failure to conduct discovery on an issue critical to the maintenance of her complaint is not a sufficient reason to deny the FBI's motion for summary judgment.  The pretrial scheduling order gave the parties more than five months to conduct discovery and permitted each side to serve interrogatories and conduct up to 10 depositions (Pretrial Scheduling Order, docket entry # 9, at 2). But Luxich failed to conduct discovery on this issue. Because "[p]laintiffs have the burden of establishing the facts necessary to justify equitable tolling," Byers v. Follmer Trucking Co., 763 F.2d 599, 600–01 (3d Cir. 1985), Luxich may not

use her failure to conduct discovery on the issue as a shield to save those portions of the complaint that are time barred.   Walls v. General Motors, Inc., 906 F.2d 143, 147 (5th Cir. 1990) ("[Plaintiff] had ample time and sufficient opportunities to conduct the discovery procedures . . . .  He cannot now lay his failure to conduct discovery at the feet of the district court.").  Because Luxich failed to exhaust her administrative remedies with respect to these alleged instances of gender-based discrimination, she is barred from pursuing these claims insofar as she alleges that each instance was a discrete discriminatory event.

Notwithstanding the foregoing, Luxich may be able to recover for these pre-January 11, 2003 actions under a theory of hostile work environment "so long as all acts which constitute the claim are part of the same unlawful employment practice [timely brought to an EEO counselor] and at least one act falls within the time period."  Amtrak v. Morgan, 536 U.S. 101, 122 (2002).  In Morgan, the Supreme Court recognized that Title VII authorizes suit for two separate types of unlawful employment practices: "discrete discriminatory acts and hostile work environment claims."  Id. at 110.  The difference is that in a hostile work environment, "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." Ledbetter, 127 S. Ct. at 2175.  In O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006), the Third Circuit compiled a non-exhaustive list of conduct that will always be considered a discrete discriminatory act and cannot be aggregated with other events to create a hostile work environment claim.  These are: "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." Id.

Under this standard it is evident that two of the six pre-January 11, 2003 incidents that Luxich complains of (#s 3 and 4 in above list) are discrete acts.  Failure to train and the

assignment of additional responsibilities are easily identifiable actions that occur at a specific point in time.  These incidents are time barred and may not be bootstrapped into a claim for hostile work environment.  The other four incidents consist of comments made towards Luxich which, over time, made her feel like she was being badgered by her supervisors.  These incidents are arguably related to the February 13, 2003 comment that Luxich complained about to the EEO counselor, so the Court will consider them for purposes of liability under a hostile work environment theory.

Albeit several of Luxich's allegations are procedurally barred, the Court will analyze the substance of each of her claims as if all allegations were timely brought before an EEO counselor.  As discussed below, even if the Court were to consider all of the time-barred incidents of alleged discriminatory conduct, Luxich's three Title VII claims still fail as a matter of law.

**2.  Gender Based Discrimination**

Title VII employment discrimination cases are analyzed under the three-step burden shifting framework first announced by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later clarified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). First, Luxich bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802.   Second, if Luxich makes a prima facie case of discrimination then the burden of production shifts to the FBI "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  Id.  Finally, if the FBI articulates a legitimate nondiscriminatory reason, then the burden shifts back to Luxich to prove by a preponderance of evidence that the FBI's proffered reasons are merely a pretext for

discrimination.  Jones v. School Dist., 198 F.3d 403, 410 (3d Cir.1999) (citing Burdine, 450 U.S. at 252–53).  "It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

To establish a prima facie case of discrimination, a plaintiff must prove the existence of four factors: (1) that she was a member of a protected class under Title VII; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; (4) "under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  Jones, 198 F.3d at 410–11.  If the plaintiff meets her burden of producing this evidence, then the employer must introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Once the employer has met the "relatively light" burden of producing a legitimate nondiscriminatory reason for the adverse employment action, id. at 763, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764.

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

Id. at 765 (citations and quotations omitted).

Luxich claims that she was demoted from the FM position in April, 2003 because she is a woman.  For purposes of establishing a prima facie case of discrimination, it is undisputed that Luxich is a member of a protected class under Title VII and that she was qualified for the position.  However, the FBI disputes that she suffered an adverse employment action.

The Supreme Court has defined a tangible employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Although the FBI disputes that Luxich was even temporarily demoted from the FM position in April, 2003, Luxich has produced sufficient evidence to satisfy her burden of production on this point.  She produced an employee organizational chart that shows Wong was the "Acting FM" as of April 15, 2003.  (Decl. of John Boppert, Ex. B.)  Additionally, she testified that during this period in the spring of 2003, Wong moved into her office and she was forced to sit in a different area in the office, without access to either a phone or a computer.  (Luxich Dep. at 137:4–21.)  Despite the fact that Luxich's salary was not reduced, the evidence produced by Luxich tends to show that she was temporarily demoted from her job.

The FBI next argues that even if Luxich did suffer an adverse employment action, this

did not occur under circumstances giving rise to an inference of discrimination.  While Luxich has not produced an overwhelming amount of evidence that indicates she was demoted for discriminatory reasons, it is undisputed that her temporary replacement in April, 2003, Wong, and the individual who replaced her after she voluntarily transferred departments in November, 2003, are both males.  (Stip. of Facts, Final Pretrial Order, at 6–7.)  "At the prima facie case stage of the analysis, we merely determine whether a plaintiff has presented sufficient evidence so that we should consider a defendant's proffered reasons for its decision and, if the defendant has presented reasons, the plaintiff's evidence of pretext."  Jones, 198 F.3d at 412.  In Jones, the Third Circuit indicated that this prong of the prima facie case could be satisfied by a showing that the plaintiff was replaced "by a person not of the protected class."  Id. at 410–11.  Such is the case here, so the Court finds that Luxich has met her burden of production with respect to establishing a prima facie case of discrimination.

The FBI asserts that shortly after Ruiz joined the Newark office, he and SAC Allen decided that the FM position was too important to be staffed by a part-time employee.  As FM, Luxich supervised five employees, oversaw the finances of the entire Newark office, and provided training to agents and management.  (Luxich Dep. at 8:22–9:16.)  The FBI claims that although Luxich was performing her job well when she was in the office, she was not in the office enough to do the type of work that management expected of the FM.

The FBI's proffered reason is clearly a legitimate, nondiscriminatory explanation for the actions it took.  Therefore, the FBI is entitled to summary judgment unless Luxich can "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . ."  Fuentes, 32 F.3d at 765.

The evidence provided by Luxich is insufficient for a reasonable factfinder to conclude that the FBI's proffered reason for demotion is unworthy of credence.  To demonstrate pretext, Luxich points to the following comments made towards her by managers which, she claims, show animus against women:

1. On at least one occasion when Luxich declined to return to the FM position in full-time status, Ruiz stated: "can't you get a babysitter," "haven't we accommodated you enough with your situation," and told her that she was being "emotional." (Luxich Dep. at 41:10–23; Ruiz Dep. at 63:15–23.)

2. On November 21, 2002, Ruiz commented that a newly created communications center would be a good place for "misfits," such as pregnant women, to work at.  (Luxich Dep. at 122:22–123:11; Ruiz Dep. at 68:5–69:8.)

3. On February 13, 2003, Ruiz told Luxich not to speak with the SAC unless it was about the weather.  (Luxich Dep. at 91:15–17; Ruiz Dep.  at 52:5–10.)

4. On March 6, 2003, Ruiz commented that he would not provide funding to pay for training "for some guy to become a lawyer or some girl to become a teacher." (Luxich Dep. at 121:9–22; Ruiz Dep. at 74:15–21.)

5. On March 10, 2003, Ruiz referred to a certain FBI operation as being "like an abortion." (Luxich Dep. at 124:10–15; Ruiz Dep. at 75:2–76:7.)

Luxich also claims that she was assigned additional work and responsibility in September, 2002 and later in February, 2003, because she is a woman.  (Compl. at ¶¶ 19–20, 28.)

Notwithstanding the Third Circuit's admonition that "stray remarks by decision makers, unrelated to the decision-making process, are rarely given weight, particularly if they are made temporally remote from the date of the decision," Silver v. AICPA, No. 05-4252, 2006 U.S. App. LEXIS 30035, *5 (3d Cir. Dec. 6, 2006) (citing Ezold v. Wolf, Block, Schorr & Solis Cohen, 983 F.2d 509, 545 (3d Cir. 1992)), Luxich has not produced evidence to create an inference that these comments were made to her because she is a woman.  When questioned on this point at oral argument, defense counsel stated, "Well, your Honor, the connection to her

gender is the fact that she is a woman and this occurred to her."  (Oral Argument, January 10, 2007.)  This doesn't suffice.

Luxich has not produced evidence, or argued, that Ruiz's desire for a full-time FM arises from a discriminatory animus.  She has not demonstrated that men are working in part-time positions and women are not.  She also has not raised the inference that part-time work is denied working parents who perforce are women.  (In fact, the FBI's proofs indicate that her supervisor asked Luxich to return to work full-time in part so that a part-time slot could be opened up for others.)  The battle she presents is not about being female in the workplace, but rather is between a perceived entitlement to work part-time on Luxich's part, which she has not supported factually, and a management decision that the FM should work five out of the five days in the work week as opposed to three.

To survive summary judgment, Luxich must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the FBI's proffered reason for its decisions regarding Luxich's employment.  She has failed to do this.  The FBI's motion for summary judgment on Luxich's claim of gender-based discrimination is granted.

## 3.  Hostile Work Environment

The complaint alleges that Luxich resigned from the FM position in November, 2003, in order to escape the hostile work environment and harassment she had been subjected to by Ruiz and Shakir-Ullah.   In this regard, Luxich is essentially claiming that the hostile work environment led to her constructive discharge from the FM position.

In order to establish a hostile work environment claim, a plaintiff must show that the harassment was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"   Meritor Savings Bank, FSB v.

<u>Vinson</u>, 477 U.S. 57, 67 (1986) (quoting <u>Henson v. Dundee</u>, 682 F.2d 897, 904 (11th Cir.

1982)).   The Supreme Court has made clear that Title VII is not a "general civility code,"

<u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998), and has also instructed:

> Workplace conduct is not measured in isolation; instead, whether an environment
> is sufficiently hostile or abusive must be judged by looking at all circumstances,
> including the frequency of the discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere offensive utterance; and whether
> it unreasonably interferes with an employee's work performance.   Hence, [a]
> recurring point in [our] opinions is that simple teasing, offhand comments, and
> isolated incidents (unless extremely serious) will not amount to discriminatory
> changes in the terms and conditions of employment.

<u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270–71 (2001) (internal quotes and citations

omitted).

Title VII "does not mandate a happy workplace," <u>Jensen v. Potter</u>, 435 F.3d 444, 451 (3d

Cir. 2006); rather, a hostile work environment claim requires discrimination based on a protected

characteristic that is "severe enough to affect the psychological stability of a minority

employee."  <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1482 (3d Cir. 1990).  In order to establish

a hostile work environment claim, Luxich must establish the existence of five elements: "(1) she

suffered intentional discrimination <u>because of her [sex]</u>; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally

affected a reasonable person in like circumstances; and (5) a basis for employer liability is

present.  <u>Jensen</u>, 435 F.3d at 449 (emphasis added).

To find constructive discharge, the Court must "find that the employer knowingly

permitted conditions of discrimination in employment so intolerable that a reasonable person

subject to them would resign."  <u>Goss v. Exxon Office Sys. Co.</u>, 747 F.2d 885, 888 (3d Cir.

1984).  "'[I]ntolerability . . . is assessed by the objective standard of whether a "reasonable

person" in the employee's position would have felt <u>compelled</u> to resign,'—that is, whether [she]

would have had no choice but to resign."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th Cir. 1996)).

In support of her claim for hostile work environment and constructive discharge pursuant to Title VII, Luxich points to the following record evidence:

1. On six or seven occasions between August, 2002 and December, 2002, Ruiz asked Luxich to return to full-time status.  (Luxich Dep. at 39:19–41:9.)

2. On at least one of these occasions, Ruiz asked her, "Haven't we accommodated you enough?"  Ruiz also asked Luxich why she couldn't get a babysitter to watch her kids and after Luxich became upset, Ruiz told her to stop "being emotional."  (Id. at 41:19–23.)

3. On September 16, 2002, Ruiz assigned Luxich supervisory responsibility over Property, Inventory, and Procurement.  Ruiz refused to allow Luxich to assume responsibility over these areas on October 1, 2002, after the fiscal year ending September 30, 2002 ended. (Id. at 61:17–62:6.)

4. On multiple occasions in September, 2002 and November, 2002, Ruiz and Shakir-Ullah refused to provide Luxich with training as to how to perform these duties. (Id. at 70:16–72:12.)

5. On November 21, 2002, Ruiz commented that a newly created communications center would be a good place for "misfits," such as pregnant women, to work at.  (Luxich Dep. at 122:22–123:11; Ruiz Dep. at 68:5–69:8.)

6. On December 10, 2002, Ruiz told Luxich that she was not permitted to speak with other ASACs in the office, even if it involved financial matters.  (Luxich Dep. at 87:3–6.)

7. On February 13, 2003, Ruiz told Luxich not to speak with SAC Allen unless it was about the weather.  (Luxich Dep. at 91:15–17; Ruiz Dep. at 52:5–10.)

8. On March 6, 2003, Ruiz commented that he would not provide funding to pay for training "for some guy to become a lawyer or some girl to become a teacher." (Luxich Dep. at 121:9–22; Ruiz Dep. at 74:15–21.)

9. On March 10, 2003, Ruiz referred to a certain FBI operation as being "like an abortion." (Luxich Dep. at 124:10–15; Ruiz Dep. at 75:2–76:7.)

10. On June 17, 2003, Luxich learned that although Wong was serving as Acting FM, he was not given supervisory responsibility over Inventory.  (Decl. of Kathleen O'Neill-Taylor, Ex. 25, at 2.)

11. On June 24, 2003, Shakir-Ullah denied Luxich's request for annual leave for July 3, 2003.  (Decl. of Kathleen O'Neill-Taylor, Ex. 27, at 3.)

The record evidence in this case falls short of showing an actionable hostile work environment claim pursuant to Title VII.  First, Luxich has failed to show that the complained of conduct occurred <u>because she is a woman</u>, rather than for some lawful factor, such as her supervisors wanting her to return to full-time status and filling her slot with a full time worker when she refused.  To be sure, Luxich has demonstrated insensitivity on the part of Ruiz, where he disparagingly referred to pregnant women as "misfits."  This is, it appears, the only gender-based remark attributed to him.   If the Court accepts that his asking why she couldn't get a babysitter and admonishing her not to be emotional in the context of that comment does indeed qualify as insensitive, only a sexist believing only women need babysitters and only women are emotional would conclude that the remark is targeted at women.   Where Ruiz remarked, "Haven't we accommodated you enough?" any gender-based quality arises because he is talking to Luxich, who happens to be a woman, rather than because he is making a disparaging remark about women and causing harm to Luxich.  His use of "abortion" in the context Luxich describes is insensitive, but does not constitute gender-based harassment.   His conduct does exhibit exasperation in the face of Luxich's commitment to extending her grant of part-time status longer than he believed the FBI would accommodate.  (Factually, the FBI afforded this to her for more than 5 years while she raised her young family.)  While the record undoubtedly shows that there was a great deal of tension between Luxich and her supervisors over her refusal to return to work full-time, Luxich's hostile work environment fails because she has not asserted facts that would allow a reasonable jury to conclude that she was harassed because she is a woman.  <u>See</u> <u>Walton v. Mental Health Ass'n</u>, 168 F.3d 661, 667 (3d Cir. 1999) ("The fact that Meek's behavior toward Walton may have been offensive does not indicate that it was based on Walton's disability."); <u>Buffa v. N.J. State Dep't of Judiciary</u>, 56 Fed. Appx. 571, 575 (3d Cir.

2003) (repeating the rule established in <u>Walton</u> that "evidence demonstrating a poor relationship between an employer and an employee is not, by itself, sufficient to sustain a hostile work environment claim").

Second, Luxich's hostile work environment fails because the complained of conduct was neither "severe" nor "pervasive."  <u>Jensen</u>, 435 F.3d at 449.  The record contains evidence of no more than 20 different instances of allegedly hostile actions over a period of roughly 15 months.  While her supervisors conduct bothered Luxich personally, it did not occur frequently (an average of slightly more than 1 incident per month), cannot be fairly characterized as pervasive however much in plaintiff's favor it is viewed, was not "physically threatening or humiliating," and did not unreasonably interfere with her ability to perform her job.  <u>Clark County Sch. Dist.</u>, 532 U.S. at 270–71.  The Court has carefully reviewed plaintiff's proffered evidence and is constrained to hold that the allegedly hostile acts do not rise to the level of severe or pervasive in either quantity or quality.  On this record, no reasonable jury could conclude that Luxich's "working conditions were so intolerable that a reasonable person would have felt compelled to resign."  <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 147 (2004).

For these reasons, the FBI's motion for summary judgment on the hostile work environment claim is granted.

**4.  Retaliation**

Finally, Luxich claims that she was temporarily demoted from her position as FM on April 10, 2003 in retaliation for filing a complaint with the EEO on April 7, 2003.

The relevant provision of Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this [title], or because [she] has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].

42 U.S.C. § 2000e-3(1).  "To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action."  Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment action.  Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).  Once the employer proffers a legitimate, nondiscriminatory reason, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.

It is undisputed that Luxich mailed her EEO complaint on April 7, 2003, alleging that Allen, Ruiz, and Shakir-Ullah discriminated against her based upon her gender  (Decl. of John Boppert, Ex. A, at 6) and that the complaint was received by the EEO office on April 11, 2003 (Id. at 1).   The Court has also found above that an adverse employment action was taken against Luxich when she was temporarily demoted from the FM position on April, 10, 2003—one day before the EEO office received her complaint of employment discrimination.  Because Luxich has failed to show any causal link between the filing of the EEO complaint and her demotion, she has failed to establish a prima facie case of retaliation.

The Third Circuit has held that temporal proximity alone can be sufficient to draw an inference of causal connection, but only in cases where the timing is "unusually suggestive."

Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003).  In Jalil, a unanimous panel found that temporal proximity was sufficient to infer a causal link where an employee was discharged a mere two days after the decisionmaker was notified that the employee had filed an EEOC claim.  873 F.2d at 708.  Luxich argues that the three-day period between the mailing of her EEO complaint and her demotion is sufficient to establish a causal link.  The Court disagrees.

At first blush, the three-day period between the mailing of her complaint and her demotion appears to create a strong inference of causal connection. But there is no evidence that any of her supervisors were aware that she had filed her complaint when Luxich was informed that she was being demoted.  Luxich's argument ignores the fact that the complaint was not received by the EEO office until after the adverse employment action was taken.  Moreover, Luxich has not provided any evidence to show whether Allen, Ruiz, or Shakir-Ullah had knowledge that she had engaged in the protected activity when the decision was made to demote her on April 10, 2003.  When the only evidence of causal connection is temporal proximity, the plaintiff must offer evidence that the decisionmaker had knowledge of the protected activity in order to establish a prima facie case of retaliation.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 505 (3d Cir. 1997) (discussing lack of knowledge in affirming grant of summary judgment to employer); Jalil, 873 F.2d at 708 (calculating temporal proximity from the date the decisionmaker was put on notice of the protected activity); Carmody v. Pa. State Univ., No. 05-1645, 2007 U.S. Dist. LEXIS 26064 (W.D. Pa. April 9, 2007) (stating that "knowledge of the protected activity by the decisionmaker is a necessary component of a causal connection and the burden of proof lies with the plaintiff").

Ruiz and Shakir-Ullah both submitted sworn statements which indicate that they did not become aware of the complaint filed against them until after the decision was made.  (Decl. of Kathleen O'Neill-Taylor, Ex. 6, at 13; id., Ex. 7, at 6.)  Plaintiff has not provided any evidence that either they or Allen were aware that she had filed an EEO complaint against them three days earlier when the decision was made to demote her from the FM position.  So there is no genuine dispute on this point.   While it is not disputed, either, that Luxich told Shakir-Ullah in December, 2002 that she was going to seek counseling through the Employee Assistance Program (Stip. of Facts, Final Pretrial Order, at 6), this short conversation four months prior to the adverse employment action is insufficient on its own to create the necessary causal connection.

Because Luxich has failed to establish a causal link between the mailing of her EEO complaint on April 7, 2007 and her demotion on April 10, 2007, the FBI's motion for summary judgment on the retaliation claim is granted.

## V.    CONCLUSION

For all the foregoing reasons, defendant's motion for summary judgment is **granted**.  An appropriate order will be entered.


Dated: June 29, 2007                         /s/ Katharine S. Hayden_____

                                             Katharine S. Hayden, U.S.D.J.